# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| | ) CASE NO. 07-63216 |
| | ) |
| IN RE: | ) CHAPTER 7 |
| | ) |
| WILLIAM ARTHER BAECHEL, SR., | ) JUDGE RUSS KENDIG |
| | ) |
| Debtor. | ) **MEMORANDUM OF OPINION ON** |
| | ) **MOTION TO DISMISS FOR** |
| | **ABUSE (NOT INTENDED FOR** |
| | **PUBLICATION)** |

    Now before the Court is the motion of the U.S. Trustee ("UST") to dismiss the instant bankruptcy proceeding pursuant to 11 U.S.C. § 707(b)(1) and (b)(3). UST filed the instant motion on January 15, 2008. Debtor responded on January 18, 2008. The Court held an evidentiary hearing on the matter on April 10, 2008, invited supplemental briefs from the parties, and took the matter under advisement. UST filed a supplemental brief on April 18, 2008. Debtor filed no briefs after the hearing.

    The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

    This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

    Debtor filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code on October 23, 2007. He scheduled $17,209.42 in unsecured debts ($9,997.42 in unsecured nonpriority claims on Schedule F and $7,212.00 representing unsecured portions of secured claims on Schedule D), $113,061.76 in secured debt, $4116.67 per month in gross income (Schedule I, line 1), $3583.67 per month in average monthly income (Schedule I, line 16), $2616.00 per month in expenses (Schedule J, line 18), and $967.67 in monthly net income (Schedule J, line 20c). Debtor and UST both stipulated, however, that Debtor's income is less than $4,116.67, and that his monthly net income is less than $967.67. (Joint Stipulation #4.)

    Debtor contributes $75 per month to an ERISA-qualified IRA. In addition, on February

22, 2008, Debtor entered a new lease agreement that reduced his monthly rent payment from $700 to $540. Furthermore, Debtor stated on his schedules that he was making two monthly car payments: one of $221 and another of $172. He has surrendered the second vehicle and is no longer making those payments.

On January 15, 2008, UST filed a motion to dismiss under 11 U.S.C. § 707 (b)(1) and (b)(3). UST alleges that Debtor's income is sufficient to allow the funding of a Chapter 13 plan that would repay a substantial portion, possibly all, of Debtor's unsecured debts, and that allowing Debtor to proceed under Chapter 7 would therefore be an abuse of the Code. Debtor's Schedules at the time showed disposable income of $967.67 per month. Given Debtor's comparatively modest level of unsecured debt, a Chapter 13 plan payment of $300 per month would yield a 100% dividend in thirty-four months; a $600 payment would yield a 100% dividend in less than a year and a half. In a sixty month plan, Debtor would need only $167 per month to fund a plan giving a 100% dividend to unsecured creditors.

Debtor objected to UST's computation of Debtor's income, and provided proposed amended Schedules I and J at trial to suggest that Debtor had only $3,264.30 per month in gross income and $2,796.30 per month in average monthly income. Debtor's amended Schedule J shows expenses of $2,721.49, leaving $74.81 in monthly net income. There appears to be two errors on Debtor's proposed amended Schedule J: First, line 20a on Schedule J is supposed to import directly line 16 of Schedule I; it does not. The Court is using Debtor's figure from Schedule I rather than the one from the proposed amended Schedule J. Debtor reached his lower gross monthly income figure using a period of March 7, 2008 back to September 14, 2007. In addition, Debtor lists his monthly rent on his proposed amended Schedule J as $560; it is actually $540. (Joint Stipulation #9.) Debtor's monthly net income is therefore $94.81.

UST, in turn, objected to Debtor's calculations, arguing that Debtor's figure represents the lowest possible figure among all plausible ways of calculating Debtor's income, given the cyclical nature of Debtor's work and, therefore, his income. UST does not dispute that Debtor's income has dropped, but argues that it simply has not fallen *that* much. According to his 1040, Debtor's gross income in 2007 was $47,932–$3,994 per month. From January 1, 2008 to March 7, 2008, Debtor had grossed $8,193.69, an average of $3550 per month. In the CMI period–April 5, 2007 to September 28, 2007–Debtor earned $3,739.10 per month. Even the lowest of the above figures, $3550 per month, would mean that Debtor has sufficient income to repay a meaningful portion, possibly all, of Debtor's unsecured debts.

Debtor works in shipping at Hendrickson Suspensions, and has been working with that company for sixteen years. He is paid $16.72 hourly, receives 150% of base compensation for overtime, and 200% of base compensation for Sunday hours. The nature of the work is cyclical by season. Business is at its zenith in the months between Christmas and the start of summer, and at its nadir in the late fall and early winter. The Canton plant's union contract expires in the summer of 2008. Overtime has been in significantly shorter supply so far in 2008 than in corresponding weeks in 2007. A spreadsheet prepared by UST's expert witness breaking down

Debtor's income by week over the past sixty-two weeks–since January 6, 2007–was introduced by Debtor at the hearing, and both parties stipulated to its accuracy. (Debtor's Ex. A.)

Debtor's annual income has been declining for several years now. According to his Statement of Financial Affairs, Debtor's gross income was $53,232.00 in 2005 and $50,227.00 in 2006. As noted supra, his 2007 gross income was $47,932.

## LEGAL ANALYSIS

There are actually almost no disputes about either the facts *or* the law in this case. Most of the pertinent facts were established by stipulation and no material facts were disputed at the hearing. Similarly, neither party raised questions about the proper interpretation of the legal standard of 11 U.S.C. § 707(b). No other substantive statutory provisions are cited by either party (the rest being limited to jurisdictional and definitional provisions), and the total number of cases cited in all pleadings and briefs in this case is a whopping seven, all by UST.

Rather, the issue before the Court is *which facts*–specifically, in this case, which paychecks–should weigh the most strongly in determining the appropriate level of income to ascribe to Debtor. Debtor's income has varied considerably from week to week, season to season, and year to year. Debtor's unsecured debts are comparatively small; therefore, even a small variation in the amount of gross monthly income ascribed to Debtor represents a monthly payment that, even over a thirty-six month commitment period, would result in the repayment of a substantial portion of Debtor's unsecured debts.

The Court identifies two primary trends affecting Debtor's income: seasonal variation and annual decline. The spreadsheet breaking down Debtor's pay by week over the past sixty-two weeks is highly illuminating. From January 1, 2007 to April 27, 2007, a period of seventeen weeks, every one of Debtor's paychecks was over $1,000.00. In the forty-five-week period since then, only five paychecks have broken four figures. Debtor's pay plateaued at an ebb of $662.80 per week–his rate with no overtime–for much of the summer and fall of 2007, before beginning to tick upwards again starting December 7, 2007. Eight of his ten paychecks in 2008, through the end of the period captured on this spreadsheet, have been over $800.00; in the last twenty weeks of 2007, only three were over $800.00. The period immediately before and after the new year therefore represents a cyclical high, just as it did last year, but a substantially lower cyclical high than a year ago. While week-by-week figures are unavailable for years prior to 2007, the annual figures broadly establish that this phenomenon has been ongoing for years: Debtor earned $53,232 in 2005, $50,227 in 2006, and $47,932 in 2007. Each successive year's peaks have been a little less lofty, the troughs (at zero overtime) a little more prolonged. Given the sharp drop in overtime between 2007 and 2008–Debtor earned $1,540.90 in the first week of 2007 and a $664.80 in the first week of 2008–this annual decline must be conceded to be accelerating. If 2007's tallies are any guide, Debtor's best earning weeks of 2008 are already behind him, and were substantially less fruitful than the same weeks were last year.

3

The Court finds that Debtor's proposed figure of $3,264.00 per month is reasonable. UST's lowest figure of $3550 is calculating using *exclusively* weeks from the first quarter of 2008–weeks that, if past cyclical trends hold true, are actually likely to be Debtor's peak earning weeks of this calendar year. It is true that Debtor's six-month lookback period includes only ten weeks of the first quarter of 2008, while it includes sixteen weeks of 2007, including the entire (thirteen-week) fourth quarter of that year, a quarter which Debtor testified is usually a cyclical trough. However, he also testified that business usually begins to pick up around Christmastime, slightly before the new year, and the income spreadsheet reflects this: Debtor's income began to inch upwards starting with his first pay period in December of 2007, which saw his income jump from $664.80 to $814.38. Three of the four weeks in December of 2007 saw Debtor produce income in line with his post-January 1 average. The business cycle does not perfectly track the calendar year.

However, even finding in Debtor's favor on the issue of his monthly gross income does not save him from a finding of abuse in this instance. Debtor's own figures show that he has a monthly surplus of $94.81. Even in a 36-month plan, which he would now be eligible for because his annual gross median income is $39,168, below the applicable median income figure of $39,746, he could make a distribution of $3413.16 to unsecured creditors. Debtor declared only $9,997.42 in unsecured nonpriority debts. Debtor declared his intention to reaffirm his 2002 Ford Ranger. The record reflects that Debtor surrendered his 2005 Chevrolet Aveo; it does not specify whether this was accepted in full satisfaction of the debt or whether an unsecured deficiency balance has been assessed. However, the unsecured portion of that debt was listed at only $1,625.00. Even if Debtor were facing a deficiency judgment from that vehicle, his total unsecured obligations would be $11,647.42. A $3,413.16 dividend would yield a 29% dividend in the latter case and a 34% dividend if there is no deficiency balance from the Aveo with which Debtor need be concerned.

The Sixth Circuit held that dismissal of a Chapter 7 bankruptcy case under the pre-BAPCPA standard of "substantial abuse" can be predicated on either a lack of honesty or a want of need. In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989). UST focuses on the second prong, financial need. "Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal." Krohn at 127. In the case of Behlke v. Eisen (In re Behlke), 358 F.3d 429, 434 (6th Cir. 2004), the Sixth Circuit affirmed the dismissal of a Chapter 7 case as a substantial abuse of the provisions of that chapter when the facts showed that the debtors had the ability to repay up to 14% of their unsecured debts in a 36-month Chapter 13 plan, and up to 23% of their unsecured debts in a 60-month plan. The Behlke court held that this reflected a want of need.

Later, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109-8, 119 Stat. 23, reduced the standard for dismissal of a Chapter 7 case from "substantial abuse" to merely "abuse."

In the instant case, even after suffering a substantial reduction in his income, Debtor has

4

the ability to repay up to 34% of his unsecured debts in a 36-month Chapter 13 plan. His income is well below where it has been in previous years, but his unsecured debts are low, he now lives alone, and still has income near the national median. Allowing Debtor to discharge his debts in Chapter 7 when he could repay a meaningful portion of his debts in a Chapter 13 plan would be permitting an abuse of the provisions of Chapter 7.

In a separate order to be entered concurrently with this opinion, the Court will give Debtor time to convert his case to one under Chapter 13, or UST's motion to dismiss for abuse will be granted.

/s/ Russ Kendig

RUSS KENDIG
U.S. BANKRUPTCY JUDGE

**Service List:**

Edward S Asper
4733 Tuscarawas St W
Canton, OH 44708

Scott R. Belhorn
Office of the US Trustee
Howard M. Metzenbaum U.S. Courthouse
201 Superior Avenue East
Suite 441
Cleveland, OH 44114-1240

Michael V Demczyk
PO Box 867
12370 Cleveland Ave NW
Uniontown, OH 44685